# EXHIBIT 9

LEXSEE 2006 U.S. DIST. LEXIS 18192

JOHN WITTEN TUNNELL, Plaintiff, v. FORD MOTOR COMPANY, Defendant.

Civil Action No. 4:03cv074

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA, DANVILLE DIVISION

2006 U.S. Dist. LEXIS 18192

April 6, 2006, Decided

**SUBSEQUENT HISTORY:** Adopted by, Motion for new trial denied by, Motion to strike denied by, Sanctions allowed by *Tunnell v. Ford Motor Co., 2006 U.S. Dist. LEXIS 42954 (W.D. Va., June 26, 2006)*

**PRIOR HISTORY:** *Tunnell v. Ford Motor Co., 2005 U.S. Dist. LEXIS 28161 (W.D. Va., Nov. 15, 2005)*

**COUNSEL:** [*1] For John Witten Tunnell, Plaintiff: Fred Dempsey Smith, Jr., Scott C. Wall, YOUNG HASKINS MANN & GREGORY & SMITH PC, MARTINSVILLE, VA; James Warren Haskins, James Richard McGarry, YOUNG HASKINS MANN & GREGORY PC, MARTINSVILLE, VA.

For Ford Motor Company, Defendant: Barry C. Toone, Brian R. Booker, John J. Leshinski, III., Paul G. Cereghini, BOWMAN & BROOKE LLP, PHOENIX, AZ; Brian K. Telfair, Julie A. Childress, Candace Ali Blydenburgh, Elizabeth Alice Kinland, BOWMAN AND BROOKE LLP, RICHMOND, VA; John R. Reid, Jr., CABANISS SMITH TOOLE & WIGGINS PL, ORLANDO, FL; John W. Smith, Ronald E. Cabaniss, CABANISS SMITH TOOLE & WIGGINS PL, MAITLAND, FL; Kara Tertzag, FORD MOTOR COMPANY, DEARBORN, MI.

**JUDGES:** Michael F. Urbanski, United States Magistrate Judge.

**OPINION BY:** Michael F. Urbankski

**OPINION:**

### REPORT AND RECOMMENDATION

This matter is before the court on plaintiff John Witten Tunnell's ("Tunnell's") motion for entry of default judgment and motion for new trial due to Ford's failure to produce certain documents during discovery. These motions were referred to the undersigned on January 31, 2006 for report and recommendation pursuant to *28 U.S.C. § 636(b)*. A hearing [*2] was conducted on March 21, 2006.

Tunnell contends that defendant Ford Motor Company's ("Ford's") flagrant pattern of discovery abuses warrants entry of the extreme sanction of default judgment, and that certain new evidence not produced in discovery justifies the grant of a new trial. Specifically, Tunnell argues that documents concerning a battery cutoff device manufactured by Tyco and used by Aston Martin after 2000 were not produced in discovery in this case despite Tunnell's Rule 34 document requests calling for the production of such information and court orders requiring their production. Several months after the trial of this case, Tunnell learned of the existence of certain Tyco and Aston Martin documents produced by Ford in a similar case in Texas.

In its written response, Ford sought to excuse its failure to produce these documents on inadvertence, claiming that "Ford's outside counsel did not produce these documents simply due to oversight." (Docket No. 570, at 6) At the March 21, 2006 hearing, however, Ford backed away from its written representation that the documents were not produced due to "oversight," and filed a new affidavit from former Ford counsel asserting that [*3] the decision not to produce the new documents was a deliberate one. (See Docket No. 578, Ex. 1 at PP13-15)

I

Throughout this case, Ford has exhibited a troubling disregard for its discovery obligations under the Federal Rules of Civil Procedure. During discovery, Tunnell requested production of any documents provided to Ford by certain companies, including Tyco, "on the subject of battery disconnects and/or battery disconnect shut-offs." Ford objected to this request, the objection was overruled on March 19, 2004, and Ford was ordered to produce any responsive documents in its possession.

On May 6, 2004, Ford served amended supplemental responses to plaintiff's request for production of documents, indicating that "Ford has conducted a duly diligent search of those records most reasonably believed to possess or contain the information pertaining to Plaintiff's request and Ford has not located any responsive documents." Ford produced additional documents on May 21, 2004, shortly before the then-scheduled trial in July, 2004.

Ford's supplemental document production prompted Tunnell to file a motion for evidentiary sanctions as a result of Ford's failure to comply with the [*4] March 19, 2004 discovery Order. As noted in the ensuing Order dated June 11, 2004, "Ford's tardy response led Tunnell to question the level of Ford's diligence in searching for documents required to be produced under the March 19, 2004 discovery order, yielding the argument that Ford only produced documents when it was forced to do so." (Docket No. 120, at 2-3) In lieu of the requested evidentiary sanctions, Tunnell was allowed to take certain additional depositions after the discovery cutoff.

These depositions were taken on July 8 and 9, 2004, at which time Tunnell first learned that Tyco may have manufactured a battery disconnect device. (Docket No. 245, at 4-5) On July 9, 2004, Ricky Dolloff testified as follows:

> Q. Do you know who the other manufacturers of battery disconnects are?
>
> A. I seem to remember the name Tyco, that's really the only one that comes to mind.

(Docket No. 245, Ex. 8 at 54)

As a result, on August 9, 2004, Tunnell requested an extension of time to take three additional Rule 30(b)(6) depositions, including one of Tyco. As the trial had been continued until October 26, 2004, Tunnell was allowed to take the deposition of Tyco. (Docket No. [*5] 261)

The Order allowing Tunnell to take the Tyco deposition followed shortly on the heels of a major discovery dispute, caused by Ford's failure to produce another document relevant to the issues in this case that one of Tunnell's experts came across outside of this case. That dispute concerned Ford's failure to produce a document entitled "Collision and Non-Collision Fire Potential Campaign Prevention Report" ("Fire Report") dated March 1, 1988. As detailed in the Memorandum Opinion dated August 16, 2004, the court allowed Tunnell to conduct additional discovery on the issues raised in that document. Because of Ford's failure to produce that document in discovery, the additional discovery was to be conducted at Ford's expense. (Docket Nos. 254, 255)

Remarkably, Tunnell continued to experience discovery problems, and further sanctions against Ford ensued. On October 8, 2004, shortly before the new trial date, Tunnell filed a supplementary motion for sanctions, again contending that Ford engaged in tactics designed to delay and thwart discovery on the issue of the Fire Report. (Docket Nos. 299, 300) In a Report and Recommendation entered on October 25, 2004, the undersigned wrote: [*6]

> Following review of the briefs filed in this case and consideration of the oral argument of counsel, it is clear that despite three prior discovery orders issued by the court and sanctions previously imposed, Ford has not gotten the message that complete discovery on all issues relevant to this case is required. Instead, Ford's conduct since the August 16, 2004 sanctions order demonstrates that Ford apparently prefers a strategy of litigation gamesmanship, impeding effective discovery on one aspect of this case. This recent conduct, following on the heels of the August 16, 2004 sanctions order, leaves no choice but to recommend additional sanctions at this time.

(Docket No. 348, at 1) The recommended sanctions

included the following: that the jury be informed of Ford's failure to produce the Fire Report, that a fact related to that report be established at trial, and that Tunnell be awarded his costs and fees incurred in connection with all of the motions, briefs and discovery related to the issue of the Fire Report. (Docket No. 348, at 8)

The trial was subsequently continued again, this time until June, 2005. In the intervening period, Tunnell again moved for sanctions [*7] due to yet another discovery problem. This time, plaintiff's motion was based on other documents not timely produced by Ford, including documents regarding the use of an inertia switch to cut off certain electrical functions in Jaguar automobiles. By Order dated April 22, 2005, Ford was required to supplement its document production once again, and file a sworn certification of efforts undertaken to obtain any remaining responsive documents. (Docket No. 418) On May 4, 2005, Ford filed the affidavit of Kara Tertzag, an attorney in Ford's Office of General Counsel, regarding Ford's additional discovery efforts. (Docket No. 448)

On June 11, 2005, upon the close of Tunnell's evidence at trial, the court granted Ford's motion for directed verdict. The court found that the opinion of Tunnell's expert witness, Jerry Wallingford, lacked a scientific basis on the existence of a product defect, and that given plaintiff's dearth of other evidence on this topic, Tunnell could not establish that the Mustang contained a defect that rendered it unreasonably dangerous for ordinary or foreseeable use. The court found that Tunnell did not provide legally sufficient evidence to demonstrate that his [*8] proposed battery cutoff device ("BCO") satisfied the risk-benefit analysis; specifically, that the battery cutoff device, taken as a whole, would have provided safety benefits that outweighed its safety risks. The court reasoned:

> Without sufficient evidence that Plaintiff's BCO satisfied this risk-benefit analysis, Plaintiff cannot establish that the absence of a BCO on the Ford Mustang at issue amounted to a defect that rendered the Mustang unreasonably dangerous. This critical defect leaves Plaintiff incapable of proving his case. Although the Court also harbors great doubts as to whether Plaintiff could establish the element of causation -- namely, whether the BCO would have prevented the fire at issue in this case -- Plaintiff's failure to demonstrate the first element of its cause of action is dispositive.

(Docket No. 516, at 10)

On September 2, 2005, the court denied Tunnell's first motion for new trial and for sanctions. (Docket Nos. 533, 534) In that motion, Tunnell argued that he need not provide a risk-benefit analysis in this case because there was evidence that the proposed alternative design was already in use. Tunnell contended that he presented evidence [*9] at trial to show that in certain 1988 models, Jaguar employed a device which disconnected battery power to dashboard circuits in a collision by means of an impact signal from an inertia switch. Tunnell stated, "Plaintiff's evidence established that the alternative design advocated for the 1999 Mustang had been used on Jaguar for many years which is sufficient to infer that the benefits of using the system outweighed the risks." (Docket No. 519, at 21) The court rejected Tunnell's argument, finding that his proposed use of an inertia switch in a protective manner had never been pursued by any other manufacturer. The court reasoned:

> Specifically, the inertia switch would cut off not just a particular circuit, such as a fuel pump, but *all circuits* in the car except a few so-called critical circuits. Further, based on the evidence before the Court, no other vehicle in the industry has such a device. Further, Plaintiff's own proposed design did not even identify exactly which "critical" circuits would be excepted (preferring instead to impose that onus upon the defendant), so it is simply impossible to say that the proposed design is the same as one already in use. For this [*10] reason, Plaintiff cannot maintain that this case is analogous to those cited above, where the fact that a proposed design was previously in use already provided adequate evidence as to the risk-benefit analysis. Second, and equally important, the above cases are distinguished because their proposed alternative designs did not create potential new safety risks.

(Docket No. 533, at 7-8)

On November 10, 2005, the court awarded Tunnell $ 101,952.11 in costs and fees associated with discovery taken pursuant to the August 16, 2004 Order, as a result of Ford's failure to produce the Fire Report. (Docket No. 558)

II

Given this background, it is difficult to accept Ford's initial excuse of an "oversight," (Docket No. 570, at 6), particularly considering the many hearings on motions to compel, repeated representations to the court by Ford's counsel (both in-house and outside counsel) that all documents had been produced, and prior court orders requiring production of the requested documents and awarding sanctions against Ford. The court's prior orders detail the distressing magnitude of Ford's discovery failings in this case, resulting in both evidentiary and monetary sanctions [*11] against Ford. Given Ford's track record in conducting this litigation, it strains credulity to accept its claimed "oversight." This is particularly true given the timing of the claimed "oversight." Ford contends that its in-house counsel sent the documents in question to its outside counsel on November 11, 2004, a mere seventeen days after the Report and Recommendation recommending evidentiary sanctions against Ford for its discovery delays flowing from its failure to timely produce the Fire Report was issued. Given the recent award of sanctions against Ford for its discovery failures, it is beyond comprehension that any Ford counsel could have allowed relevant and responsive documents not to be produced "due to oversight."

III

Ford's subsequent position is even more troubling. At the hearing on March 21, 2006, Ford changed its tune, acknowledging that the decision not to produce the new Tyco and Aston Martin documents was one of commission, rather than omission. In the affidavit of former Ford counsel Brian Telfair, and in representations made at the hearing, Ford suggested that the documents were not produced because they confirmed the fact that Aston Martin had never designed [*12] or sold a vehicle equipped with a "crash-activated and/or crash-sensing battery cut-off switch," and thus were not related to plaintiff's defect theory. (Docket No. 578, Ex. 1 at PP13-15) Ford's argument that the documents produced in Texas are not relevant or material to this case because they concern a non-collision activated switch is both procedurally and substantively flawed. The Tyco and Aston Martin documents are directly responsive to Tunnell's document requests 9 and 21 n1 and the court's March 19, 2004 Order granting Tunnell's motion to compel. As such, Ford was obligated under the Federal Rules to produce these documents to Tunnell. Ford lodged relevance, burden and many other objections at the March, 2004 hearing on the motion to compel, but those objections were overruled by the court, and Ford was plainly on notice that it was required to produce documents such as these.

n1 Document Request 9 stated: Produce all documents in your possession which have been provided to you by any of the following companies on the subject of battery disconnects and/or battery shut-offs: First Technology (or any of its predecessors or subsidiaries such as First Inertia Switch), Tyco, Visteon, Siemens, Delphi, Auto Kabel, TRW, Intra, Johnson Controls, Lear, AFL or GNB.

Document Request 21 stated: Produce all documents that pertain to, relate to, describe or mention placing battery disconnects on other Ford Motor Company owned vehicle lines, including, but not limited, Volvo, Mazda, Lincoln, Mercury, Jaguar, Austin (sic) Martin, Land Rover and Ford Europe. (See Docket No. 16, at 9-10)

[*13]

It is particularly difficult to accept the rationale underlying Ford's counsel's deliberate decision not to produce these documents as it was made just a few days after the undersigned recommended evidentiary sanctions against Ford because "Ford has not gotten the message that complete discovery on all issues relevant to this case is required." (Docket No. 348, at 1) Given the posture of this case at that time, it is difficult to view Ford's decision not to produce these documents as being consistent with its good faith discovery obligations.

Ford's attempt to distinguish the Tyco device as a "non-collision activated switch," (Docket No. 570, at 2), is likewise unavailing. On their face, the new documents note that one of the two safety functions performed by this device is to respond to a crash signal by

disconnecting the battery from the vehicle wiring system "in the event of a crash." (See, e.g., Docket No. 562, Ex. E) Given the face of the documents, Ford's effort in its brief to suggest that it was not designed to afford protection in the case of a crash is absurd. At the hearing, Ford offered evidence in the form of excerpts from an Aston Martin owners manual to suggest [*14] that the battery disconnect switch used in its vehicles is merely manual and is designed to facilitate storage of the vehicle without quiescent battery drain. (Docket No. 578) Ford also pointed out that the last line of the first page of the new documents, bearing number FMC 1549, makes it clear that the switch was not used in Aston Martin vehicles in crash applications. n2 While Ford may well be correct on Aston Martin's use of the Tyco switch, the problem is that its failure to produce the documents in the possession of its counsel did not afford Tunnell with the opportunity to test Ford's assertion that these documents are of no moment. Simply put, good faith compliance with discovery obligations did not give Ford the unilateral ability to withhold these documents from plaintiff.

> n2 That line reads: "This feature has not been used (Vanquish/DB7) due to energy management requirements of the SRS/RCM in the event of crash and secondary impacts." Vanquish and DB7 are models of Aston Martin vehicles. See www.astonmartin.com.

[*15]

IV

While the undersigned agrees fully with Tunnell that these documents should have been produced in discovery and continues to be distressed by Ford's handling of the discovery in this case, I cannot recommend that either Tunnell's request for default judgment or for a new trial be granted under the standards applicable to those motions. There does not appear to be sufficient prejudice to Tunnell from Ford's failure to timely produce these documents.

The documents about which Tunnell complains consist of twelve pages, numbered FMC 1549-1560, and relate to two or more Tyco battery disconnect switches. Certain of those documents are dated, and the dates range from October, 2000 to February, 2001, after the date of the accident in this case. Review of the new documents reveals that they concern the same sort of Tyco battery disconnect switch of which Tunnell was aware during discovery in this case. Indeed, page one of Exhibit 5 to the deposition of Roger Thrush, the Rule 30(b)(6) Tyco corporate representative deposed on September 22, 2004, appears to depict the very same Tyco battery disconnect switch pictured on new documents FMC 1552 and 1556. Further, page two of Exhibit [*16] 5 to the Thrush deposition appears to contain the same dimensional drawing found on new document FMC 1557. Additionally, certain information contained on page three of Exhibit 5 to the Thrush deposition regarding the specifications of the Tyco battery disconnect switch is set forth on new document FMC 1553.

It is clear both from these documents and from the text of the Thrush deposition itself that Tunnell was aware of the fact that Tyco was manufacturing and selling battery disconnect switches serving the same function as those in the new documents and upon which he founds his motions. In particular, Thrush, a Development Engineer/Engineering Manager for Tyco, testified at length about Tyco's involvement with the development of battery disconnect devices in his September, 2004 deposition. Thrush testified that the first available battery disconnect device was developed "right around 2000." (See Thrush Dep. 12)

Tunnell argues that certain of these contested documents, namely FMC 1553-55, are of particular significance because they reflect an Aston Martin part number, indicating that such a device was actually installed on vehicles from this manufacturer. These documents are dated [*17] February 28, 2001. Tunnell's argument that these documents provided him with new information, however, is undermined by the fact that Thrush, in his September 22, 2004 deposition, testified that Aston Martin started buying the battery disconnect switch from Tyco sometime after 2000. (See Thrush Dep. at 13) Thus, as of the date of the Thrush deposition, Tunnell knew that Aston Martin was buying the Tyco battery disconnect switch.

When questioned at the hearing about the fact that certain of the new documents concerned the same switch depicted in Thrush deposition Exhibit 5, Tunnell focused his argument on the fact that the documents bearing numbers FMC 1553-55 reflect a different Tyco part number than the disconnect switch shown in Thrust deposition Exhibit 5. While that indeed appears to be the

case, it is clear from a comparison of these documents that both Tyco switches perform the same function and operate to disconnect the battery in the case of crash, short circuit or while the vehicle is being transported, stored or serviced. Thus, while documents FMC 1553-55 reflect different part numbers, the documents indicate that the battery disconnect switches serve the same functions, [*18] and, importantly, will disconnect the battery in the event a crash signal is received by the switch.

Tunnell also argues that the information contained on the bottom of page FMC 1554 is the most detailed technical information he has discovered in this case concerning how a battery disconnect switch actually installed on a production automobile operates. Tunnell contends that the bottom of page FMC 1554 refers to a delayed disconnection of the load circuit independent of the ignition and starter signal. Tunnell asserts that the information contained on this document bears some resemblance to the prototype disconnect device created by his expert witness, Jerry Wallingford. Tunnell argues that this document could lead to evidence regarding the risk-benefit analysis engaged in by an auto maker in determining whether to install such a switch, evidence found to be lacking in plaintiff's case-in-chief at trial.

There are two problems with this argument. First, separate and apart from this document, Tunnell learned in discovery that Tyco had developed a switch that left some circuits on after a crash while disconnecting the main electrical circuits in the car. Roger Thrush of Tyco testified [*19] as follow:

> Q. For example, Mr. Thrush, do you know Tyco's efforts and design efforts to develop a battery disconnect switch that leaves some circuits on after a crash while disconnecting the great majority of the circuits within a car?
>
> A. I am aware by just from a standpoint of what's been told to me that that exists at this time, but I am not aware of an application.

(Thrush Dep. at 40) Although the trial was months away, Tunnell did not pursue this issue with further discovery directed to either Tyco or Aston Martin.

Second, certain of the new documents indicate Aston Martin did not, in fact, use the battery disconnect device to disconnect the battery in the case of a crash. As Ford pointed out, the document labeled FMC 1549 states that "the crash signal has not been used (Vanquish/DB7) due to energy management requirements of the SRS/RCM in the event of crash and secondary impacts." Ford also introduced evidence from several Aston Martin owner's manuals that the battery disconnect device was a manually operated feature used to disconnect the battery when a car is being stored. n3

> n3 Ford presented an example of Aston Martin owner's manual at the March 21, 2006 hearing, and several more were attached to a notarized affidavit of Clinton Forde dated March 31, 2006. Although Tunnell has filed an objection to the Forde affidavit due to the timing of its filing and certain differences from an earlier, unexecuted version, there is no reason to doubt the accuracy of the Aston Martin owner's manuals attached to the Forde affidavit. As such it is recommended that Tunnell's motion to strike the Forde affidavit be denied.

[*20]

While it is clear that Ford should have produced these documents during discovery in this case, it is equally clear that Tunnell was aware, by means of the Thrush deposition, of the Tyco switches and the fact that Aston Martin presently was purchasing certain of these switches from Tyco. Thrush also testified that he was aware of a Tyco switch that left some circuits on in a crash while disconnecting the majority of the current. Given that Tunnell had this information no later than September, 2004 and that the trial of this case was not held until June, 2005, it is difficult to see how Tunnell was prejudiced by Ford's failure to produce documents in this case, and thus how the severe sanctions sought by Tunnell would be justified.

Finally, the information contained in the Tyco documents could not have remedied the deficiency in plaintiff's case. The fact that Aston Martin began using the Tyco switch after the accident does not provide Tunnell with the evidence his case lacked -- proof of a defect at the time the Mustang was manufactured. Not only do the Aston Martin documents relate to a period after the accident in this case, Tunnell's argument that these documents would have made [*21] a substantive

difference in the trial is unavailing. These documents provide no more evidence of a defect than the fact introduced at trial that Jaguar employed a battery cutoff device in certain of its models beginning in 1988. The reasoning in the court's Memorandum Opinion of September 2, 2005 regarding the Jaguar device applies with equal force to Aston Martin's subsequent use of the Tyco device.

V

Under the standards applicable under *Rule 60(b)*, Tunnell's motion must fail. To be successful on a motion for new trial under *Rule 60(b)(2)*, Tunnell must demonstrate that: (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that it is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended. *Boryan v. United States, 884 F.2d 767, 771 (4th Cir. 1989)*; *United States Fid. & Guar. Co. v. Lawrenson, 334 F.2d 464, 465 n.2 (4th Cir. 1964)*, cert. denied, *379 U.S. 869, 85 S. Ct. 141, 13 L. Ed. 2d 71 (1964)*. [*22] Tunnell cannot meet all of these requirements. As Tunnell took discovery from Tyco and learned before trial of the sale of battery disconnect switches to Aston Martin, the evidence cannot be considered to be newly discovered since the judgment. Tunnell had an opportunity to press for discovery on this issue, but did not. Further, as the new documents are very similar to those introduced as Exhibit 5 at the deposition of Tyco's Roger Thrush, they may fairly be characterized as cumulative. Finally, for the reasons noted above and following the rationale in the court's September 2, 2005 Memorandum Opinion on the first motion for new trial, these documents are not likely to produce a new outcome if the case were retried. As such, there is no basis for a new trial under *Rule 60(b)(2)*.

It is likewise clear that the requirements of *Rule 60(b)(3)* are not met. In *Square Construction Co. v. Washington Metropolitan Area Transit Authority, 657 F.2d 68, 71 (4th Cir. 1981)*, the Fourth Circuit set forth three factors that a moving party must establish to prevail on a Rule 60(b)(3) motion: (1) the moving party must have a meritorious defense; (2) the moving party must prove misconduct [*23] by clear and convincing evidence; and (3) the misconduct prevented the moving party from fully presenting its case. While an adverse party's failure, either inadvertent or intentional, to produce obviously pertinent requested discovery material in its possession is misconduct under the meaning of *Rule 60(b)(3)*, *Schultz v. Butcher, 24 F.3d 626, 630 (4th Cir. 1994)*, there is no evidence, much less clear and convincing evidence, that Ford's failure to produce the new documents prevented Tunnell from fully and fairly presenting his claim. Although it was late in the game, Tunnell became aware of the Tyco switch during the discovery period and also learned during the Thrush deposition that it was sold to Aston Martin sometime after 2000. As the trial date was continued to a date some eight months after the Thrust deposition, Tunnell could have pursued further discovery on this point.

While Tunnell argues correctly that under *Rule 60(b)(3)* new evidence does not have to be result-altering to warrant a new trial, *Schultz, 24 F.3d at 631*, he cannot otherwise meet the requirements of the *Square Construction* test because he learned of the Tyco [*24] switch and the purchase by Aston Martin during the discovery period. Thus, it cannot be said that Ford's misconduct in not producing the new documents prevented Tunnell from fully and fairly presenting his claim.

VI

For the same reason, Tunnell may not obtain the extreme remedy of a default judgment as a sanction under *Rule 37*. Again, because Tunnell was aware eight months before trial that Aston Martin began buying the Tyco battery cutoff device sometime after 2000, Tunnell cannot demonstrate the level of prejudice necessary for the severe sanction of default judgment. See *Mutual Federal Sav. & Loan Ass'n v. Richards & Assoc., Inc., 872 F.2d 88, 92 (4th Cir 1989)*; *Wilson v. Volkswagen of America, 561 F.2d 494, 503-06 (4th Cir. 1977)*. Also, as it does not appear that the outcome of this case would have been altered by production of the new documents, the interests of justice are not served by awarding a default judgment in this case. It simply cannot be said in this case that the failure to produce the new documents materially prejudiced Tunnell's ability to fairly present his case or would have changed the outcome of this case. Under these [*25] circumstances, the extreme sanction of a default judgment is not warranted. *Wilson, 561 F.2d at 504-05*.

VII

While a default judgment sanction may not be warranted, a sanction of attorney's fees and costs for Ford's ongoing discovery failures is called for in this case. Because an attorney's fees award is collateral to the merits of the underlying action, the district court retains jurisdiction to entertain motions for sanctions under *Rule 37*, even after the final judgment has been appealed. *Lancaster v. Independent Sch. Dist. No. 5, 149 F.3d 1228, 1237 (10th Cir. 1998)* (holding attorney's fees awards are collateral matters over which the district court retains jurisdiction and stating "we see no basis to distinguish [cases involving statutory grants of attorney's fees to the prevailing party] from one like the present case in which fee awards are granted as sanctions."); *Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 212 F.R.D. 341, 343 (E.D. Ky. 2003)* ("While divested of jurisdiction over the substantive matters in a case, a district court is in the best position to decide certain collateral matters as fees, [*26] costs and sanctions, particularly as the district court presided over the relevant discovery.")

If this was Ford's only discovery failing in this case, or if, indeed, the failure to produce was inadvertent rather than deliberate, the undersigned likely would be persuaded to leave matters at that. But this obviously is not Ford's only discovery failing, and the Brian Telfair affidavit establishes that Ford's counsel deliberately chose not to produce the new documents to Tunnell.

"The Fourth Circuit has developed a four-part test for a district court to use when determining what sanctions to impose under *Rule 37*. The court must determine (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that non-compliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Anderson v. Foundation for Advancement, 155 F.3d 500, 504 (4th Cir. 1998)*, quoting *Wilson, 561 F.2d at 505-06*.

While the standard set forth in Wilson does not require that the extreme sanction of default be imposed in this case, certain factors in the [*27] *Wilson* calculus compel imposition of additional sanctions against Ford.

First, Ford cannot seem to get its story straight as to why the new documents were not produced. In its brief in opposition, Ford states that "Ford's outside counsel did not produce these documents simply due to oversight." (Docket No. 570, at 6). The Telfair affidavit filed at the hearing, however, tells another tale. It states:

> 14. Because the Aston Martin / Tyco documents sent to me were not related to Plaintiff's defect theory (i.e., not related to "crash-activated or crash-sensing battery cut-off switches"), I concluded that the Aston Martin / Tyco documents were not appropriate for production and that no further action was necessary.

(Docket No. 578, Ex. 1) Counsel for Ford made this decision on or about November 11, 2004, (Docket No. 578, Ex. 1 at P12), just two weeks after the undersigned noted in the Report and Recommendation of October 25, 2004:

> It is clear that despite three prior discovery orders issued by the court and sanctions previously imposed, Ford has not gotten the message that complete discovery on issues relevant to this case is required. Instead, Ford's conduct [*28] since the August 16, 2004 sanctions order demonstrates that Ford apparently prefers a strategy of litigation gamesmanship, impeding effective discovery on one aspect of this case. This recent conduct, following on the heels of the August 16, 2004 sanctions order, leaves no choice but to recommend additional sanctions at this time.

(Docket No. 348, at 1) After getting this message in the October 25, 2004 Report and Recommendation, it is difficult to fathom how Ford, in good faith, could have chosen not to produce the new documents two weeks later.

Ford argued at the hearing that as it has now "run this matter to the ground" and determined for itself that there was no merit to the assertion that Aston Martin employed a battery cutoff device in a manner similar to that posited by plaintiff's expert Wallingford, Tunnell's motion for sanctions is moot. The problem with Ford's argument is that our adversary system does not afford Ford the luxury of making such a unilateral determination. The search for truth underlying our system of justice requires that opposing arguments and theories be subjected to the crucible of discovery required by the

Federal Rules of Civil Procedure. When [*29] one side fails to meet its obligations, the search for truth is thwarted. At the end of the day, it may indeed be true that Ford's position on the use of the Tyco switch by Aston Martin is correct. However, Ford is not permitted to hide responsive documents from Tunnell, decide that from its perspective production of the documents would not impact the case, and, when called out on the discovery violation, cry "no harm, no foul."

Second, the timing of Ford's decision not to produce the new documents and the history of this case require that additional monetary sanctions be imposed against Ford to deter it and others from hiding documents in discovery. As early as the spring of 2004, Tunnell argued that "Ford only produced documents when it was forced to do so," (Docket No. 120, at 2-3), a statement that has proven to have some predictive value in this case.

In the Order dated June 11, 2004, Tunnell was allowed to take additional depositions outside of the discovery cutoff in lieu of the requested evidentiary sanctions. Ford was not deterred.

Later in the summer, Tunnell's expert ran across Ford's Fire Report, a document not produced by Ford in discovery, and Tunnell was permitted [*30] on August 16, 2004 to take certain additional discovery on the issued raised in that document at Ford's expense. (Docket Nos. 254, 255) Ultimately, Tunnell was awarded $ 101,952.11 in attorneys fees and costs to fight the discovery battle over the Fire Report and engage in the discovery allowed. (Docket No. 558) Ford was not deterred.

Further discovery problems led to the Report and Recommendation of October 25, 2004, (Docket No. 348), portions of which are quoted above and which recommended certain evidentiary sanctions against Ford for its continued pattern of discovery failings. As evidenced by its decision two weeks later not to produce the new documents that are the subject of this motion, Ford was not deterred.

The plaintiff in this case has been required time and again to move the court to require Ford to comply with its discovery obligations under the Federal Rules of Civil Procedure, and twice has uncovered documents outside of this case bearing on the issues in this case of which Ford was aware, yet chose not to produce. Ford, and other litigants who chose to engage in such discovery misconduct, must be deterred from such egregious behavior. Throughout this case, the court [*31] has tried to send the clear message to Ford, both by means of the text of its rulings and increasing levels of sanctions, that it needed to engage in full and fair discovery. Despite repeated court orders, Ford, undeterred, made the conscious decision to withhold production of the new documents in November, 2004. Given Ford's pattern of discovery abuse, the undersigned has no choice but to recommend additional sanctions against Ford to deter further discovery violations by it and other litigants.

By way of sanctions, the undersigned recommends that Tunnell be awarded the amount of attorney's fees and costs incurred by him in connection with the various discovery difficulties he has experienced in this case. Such an award includes the costs and fees incurred by plaintiff in all of the federal court motions associated with discovery issues from the date of the filing of this case in federal court through the present time, including costs and fees associated with any motions to compel, motions for sanctions, objections and any other court filings or proceedings related to discovery in this case. It is recommended that such an award also include any costs and fees associated with the [*32] pending motion for sanctions and any objection taken to this Report and Recommendation. Obviously, excluded from any such award would be any fees and costs previously awarded on November 10, 2005. (Docket 558)

For these reasons, it is recommended that (1) Tunnell's motion for new trial be **DENIED**; (2) Tunnell's motion for entry of default judgment be **DENIED**; (3) Tunnell's motion to strike the Clinton Forde affidavit be **DENIED**; and (4) monetary sanctions be awarded in the amount of plaintiff's attorney's fees and costs incurred in all of the discovery disputes in this case.

The Clerk of the Court is directed immediately to transmit the record in this case to the Honorable Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to *Rule 72(b)* they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to *28 U.S.C. § 636(b)(1)(C)* as to factual recitations [*33] or findings as well as to the conclusions reached by the undersigned

may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTER: This 6th day of April, 2006.

/s/ Michael F. Urbanski

United States Magistrate Judge